# Daniel J. and Jodi C. Kelly v. Edwin P. Lord, Helen Lord, IngaBritt Lillbask, Morris Teig, Rogert Ziccardi, Carl Roof and Department of Corrections

[783 A.2d 974]

No. 99-496

Present: **Dooley, Morse and Johnson, JJ., and Katz, Supr. J. and Gibson, J. (Ret.), Specially Assigned**

Opinion Filed September 21, 2001

*William J. Donahue*, White River Junction, for Plaintiffs-Appellees.

*Christopher Dye*, Bradford, for Defendant-Appellant Edwin P. Lord.

**Johnson, J.** Seller Edwin P. Lord appeals from several superior court orders, which address the claim of buyers Daniel and Jodi Kelly to enforce a contract to purchase Stonecliff Farm from seller. In various orders, the court ruled that (1) the parties' original installment contract was assigned by seller to a trust and subsequently modified by the trustees; (2) under the terms of the modified contract, seller must deliver the deed to the farm to buyers' attorney pending negotiations with the Agency of Natural Resources (ANR) concerning the solid waste that seller had illegally dumped on the property; and (3) the modified contract cancelled the installments buyers owed under the original contract. The court entered partial final judgments under V.R.C.P. 54(b) on these rulings and subsequently granted buyers' motion to enforce the order requiring seller to deliver the deed to buyers' attorney. Seller appeals from all of these orders. We affirm.

Following a trial by court on buyers' claim for specific performance of the contract, the court made twenty-five pages of findings, which we summarize here. In 1983, seller Edwin P. Lord acquired title to Stonecliff Farm in Bradford, Vermont. On April 26, 1990, the State of Vermont filed a criminal action, charging seller with operating a solid waste facility on the property without a certificate in violation of 10 V.S.A. § 6605(a), claiming that investigators had found more than sixty tractor-trailer truckloads of debris in a ravine about 200 yards behind the farmhouse. In the spring of 1991, buyers Daniel and Jodi Kelly drove by the property, liked it and stopped to talk to seller about buying it. Buyers inspected the property, observed the debris, and learned from town officials that the debris had been illegally dumped. Although buyers knew that a criminal action was pending, they took possession of the farm and then, a few days later, on June 28, 1991, entered into an installment land contract to purchase it.

The installment contract provided in relevant part as follows:

> (1) Buyers agreed to buy Stonecliff Farm for $300,000, of which $20,000 was paid on or before June 28, 1991, and the remaining $280,000 was to be paid in monthly installments of $3,111.00 — $1,555.50 of each payment being applied to

principal and the same amount applied to interest — for a term of fifteen years.

(2) Seller agreed to pay two notes secured by mortgages on the property. In the event that buyers paid any amount on these notes, they were entitled to deduct an equal amount from their monthly installments due to seller.

(3) Seller agreed to pay all expenses for the proper removal and disposal of the debris as required by law. In the event that buyers paid any of these expenses, they were entitled to deduct an equal amount from their monthly installments to seller.

(4) Buyers agreed to pay all real estate taxes starting in 1991.

(5) Upon receiving payment of the entire principal and any accrued interest, seller agreed to execute a warranty deed conveying the property to buyers free of any liens.

On August 7, 1991, a jury convicted seller on four counts of operating an illegal solid waste facility. Later that month, seller was sentenced to zero-to-six months on each count, consecutive, for a total maximum of twenty-four months incarceration and a $100,000 fine. The court set an appeal bond in the amount of $100,000. Seller's mother, Helen Lord, paid $70,000 for the bail, seller paid the remaining $30,000, and seller was released. Seller filed a pro se notice of appeal.

On October 21, 1991, seller created the Edwin P. Lord Irrevocable Trust, appointed Helen Lord, his mother, and IngaBritt Lillbask as trustees, and assigned "all of his interest, right and title in and to said Installment Land Contract to Helen Lord and IngaBritt Lillbask, Trustees of the Edwin P. Lord Irrevocable trust u/a/t dated October 21, 1991." Seller remained the record owner of the farm but buyers were given to understand that seller had deeded the farm to the trust. In late 1991, seller hired attorney Peter Hall to represent him in his criminal case on appeal. Attorney Hall also incorrectly believed that seller had deeded the farm to the trust and made this erroneous representation to the assistant attorney general in the criminal case, the attorney for ANR, attorney Donahue representing buyers, and Judge Cashman. In January 1992, attorney Hall began to represent Helen Lord and IngaBritt Lillbask as trustees of the trust also.

In early January 1992, seller suffered a traumatic brain injury at the home of IngaBritt Lillbask in Connecticut. On February 17, 1992,

attorney Hall entered his appearance as counsel for seller in his criminal appeal and requested a stay, alleging that seller had hired him to appeal the conviction but had since suffered a traumatic brain injury and therefore could not consult with him. This Court stayed the criminal appeal until April 20, 1992, and upon further motion, until July 6, 1992. On March 5, 1992, the Connecticut probate court appointed Camilla Lillbask as conservator of seller's estate and person.

In the spring of 1992, buyers sought a bank loan to pay off the installment contract, but the bank wanted assurance from ANR that no clean-up of the debris would be required. At this point, buyers contacted ANR, learned that clean-up would be required, and became concerned that the cost of removing the debris would exceed what they owed in principal. On August 20, 1993, ANR sent buyers and attorney Hall a draft administrative order for the clean-up, which found buyers and seller guilty of running a solid waste landfill and ordered buyers and seller to provide an engineer's report evaluating the impact of the disposal site and the cost of debris removal or capping. Attorney Hall responded to ANR, maintaining that seller had brain damage and could not make decisions on his own but that Hall was authorized to represent seller in the administrative proceedings and that a court-appointed conservator would act for seller on any agreements. On October 28, 1993, the Connecticut probate court accepted the resignation of Camilla Lillbask as seller's conservator and appointed Morris Teig as successor. Attorney Hall wrote this Court indicating that he was attempting to work out a global resolution of the criminal case and the debris removal and that Teig had been appointed seller's new conservator.

On November 24, 1993, attorney Donahue sent a letter to attorney Hall confirming their telephone conversation of that day. The letter stated that he and Hall were working toward an agreement wherein buyers would take title to the property and assume the mortgages and remediation costs, provided that seller's $30,000 bail money could be contributed. Donahue told Hall that buyers would make no further payments under the installment contract but were willing to make the mortgage payments directly to the bank. On December 10, 1993, Hall wrote Donahue, indicating that he thought the State would agree that the $30,000 in bail money could be used for the clean-up, that Teig agreed with the November 24 proposal, that buyers would have to give a third mortgage to seller/the trustees to secure buyers' obligation to

complete the clean-up, and that this mortgage would not be necessary if ANR relieved seller of clean-up responsibilities. Finally, Hall agreed that buyers would receive a deed to the property from the trust when an agreement was reached with ANR.

On December 17, 1993, the State and Hall stipulated to dismissal of seller's criminal appeal, and subsequently, this Court dismissed the appeal. On February 4, 1994, Hall moved before the district court for reduction of the sentence, alleging that seller was not able to take responsibility for himself and that Teig had been appointed his conservator. Hall indicated that seller was negotiating with ANR to clean up the property contingent on the court resentencing seller.

On March 14, 1994, the district court granted the motion for reduction of sentence, imposing a sentence as follows: (a) zero-to-six months on each of the four counts of operating an illegal solid waste facility, to run concurrently, all suspended upon conditions of probation; (b) all fines reduced to zero; and (c) probation conditions in the attached probation order, plus the additional conditions, summarized as follows:

(1) Defendant shall transfer $30,000 in bail funds to William Donahue as trustee to be disbursed to pay for costs of the clean-up of Stonecliff Farm, "to be accomplished under an agreement negotiated with the Agency of Natural Resources, Daniel and Jodi Kelly, present occupants of the Farm, defendant and the "Helen Lord Trust."[1]
(2) To effect the clean-up of the farm under the ANR agreement, defendant shall release to the Kellys all interests in the farm held by defendant or the Helen Lord Trust, subject only to the two bank mortgages and any security given by the Kellys for their agreement to clean up the property.
(3) Upon transfer of the $30,000 to Donahue and conveyance of all interests in the farm to the Kellys, the court will discharge defendant from probation.

The court issued a probation order under which (1) condition 10 required restitution of $30,000 as provided in the sentence-reduction order, and (2) condition 14 required seller "to transfer any remaining

---

[1] The court found that there is no "Helen Lord Trust." All references to the Helen Lord Trust in the sentence-reduction order and the engineering agreement were intended as references to the Edwin P. Lord Irrevocable Trust.

legal or equitable right in subject real estate to Daniel and Jodi Kelly provided said grantee clean up property in accordance with agreement with State of Vermont." Attorney Hall sent the probation order to Helen Lord, who returned it bearing both her signature and a purported signature of seller. Teig and probation officer Robert Ziccardi also signed the order.

On March 28, 1994, buyers hired the engineering firm Caswell, Eichler & Hill (CEH) to prepare a report on the clean-up. Attorney Donahue then wrote attorney Hall that he understood that seller would not be released from probation until he gave a deed to buyers and that buyers would not accept a deed until they were satisfied they could afford the clean-up. Attorney Hall replied, sending attorney Donahue an agreement entitled "Agreement Regarding Engineering Services and Clean Up" (the engineering agreement). The agreement was signed by buyers, Helen Lord and IngaBritt Lillbask, as trustees, and Teig, as seller's conservator, by May 5, 1994.

The engineering agreement states that (1) buyers are acquiring the farm under an installment contract, (2) seller is required as a condition of probation to pay $30,000 in restitution to clean up the farm, (3) buyers and ANR have agreed that buyers will do the clean-up provided there is no significant amount of hazardous waste at the site, (4) engineering assessments are necessary for ANR to determine the method of clean-up appropriate, (5) seller is required as another condition of probation to relinquish title in the Stonecliff Farm to buyers provided they undertake the clean-up under the agreement to be negotiated with ANR. The parties agreed: (1) if the engineering studies showed no significant hazardous waste, buyers would enter into an agreement with ANR to take responsibility for the clean-up and relieve seller and the trust of any responsibility; (2) seller and the trust "shall provide to the Kellys a Quit Claim Deed of all their interests in the Stone Cliff Farm property, such deed to be held in trust by William Donahue, Trustee, until such time as the Kellys enter into their assurance of discontinuance agreement with the State, as required by ¶ 2 above, to undertake the clean-up of the Stone Cliff Farm property site"; and (3) buyers shall be responsible for paying the notes secured by mortgages; seller and the trust authorize buyers to enter into negotiations with the bank necessary to finance the clean-up under the assurance of discontinuance.

In August 1994, CEH produced a report finding no hazardous materials. It estimated the cost of removal at $596,000, and the cost of

capping at $218,100, consisting of $132,700 for capping and $85,400 for water monitoring for the next twenty years. Based on the CEH report, ANR agreed on December 13, 1994, that buyers could remediate the farm by capping and monitoring.

In January 1995, a New Hampshire probate court appointed Helen Lord as guardian for seller. On February 17, 1995, the Department of Corrections petitioned the district court in the criminal case to discharge seller from probation, stating: (1) defendant has made full restitution in the amount of $30,000, (2) defendant has significant mental limitations and legal proceedings are pending for defendant's mother to obtain guardianship of him, (3) defendant has no permanent residence but stays with friends in Connecticut, Vermont and New Hampshire, (4) defendant is a "handicapped wanderer" who cannot be properly supervised on probation, and (5) defendant has not met condition # 14 — requiring transfer of the farm to buyers; however, his ability to comply with condition # 14 lies in the hands of the buyers. On February 28, 1995, the court granted the motion and released seller from probation. Neither ANR nor buyers were notified prior to seller's release from probation.

Throughout the summer and fall of 1994 buyers attempted to renegotiate seller's mortgages with the bank. In the spring of 1995, the bank accepted buyers' last offer of $65,000. Buyers then approached the Woodsville Guaranty Savings Bank to borrow $165,000 to purchase the mortgages and to begin the clean-up. The loan was scheduled to close on July 10, 1995, and the trustees were expected to be present and to deliver a quitclaim deed for Stonecliff Farm to buyers. On June 28, 1995, attorney Hall wrote attorney Donahue informing Donahue that he would no longer be representing the two trustees, and he doubted whether he could continue to represent seller. Three days later, seller petitioned the Connecticut probate court for dismissal of his conservatorship, and on July 8, an unidentified woman informed the bank that seller owned Stonecliff Farm and would not give the deed to buyers or anyone else. The closing was cancelled.

On July 12, 1995, attorney Colin Robinson wrote to attorneys Hall and Donahue informing them that the New Hampshire probate court had vacated its decree of January 22, 1995, which had appointed Helen Lord seller's guardian, and that seller intended to discharge Hall, to disavow the engineering agreement and to try to rescind the irrevocable trust. On September 6, 1995, the Connecticut probate court

found seller capable of managing his affairs, and the court terminated conservatorship over his person and his estate.

This case began on January 10, 1996, when buyers filed a foreclosure action against seller in superior court. In response, seller alleged that buyers were in default of the installment contract.[2] In May 1996, buyers moved to amend their complaint to add a claim for specific performance of the installment contract as modified by the engineering agreement and to add as defendants the trustees, Teig, Ziccardi, Ziccardi's supervisor Carl Roof and the Department of Corrections. The motion was granted. Seller counterclaimed for the money owed under the installment contract, plus interest and attorneys' fees. Two years later, on April 15, 1998, the court set the specific-performance claim for immediate trial by court, and bifurcated seller's claim for damages because seller did not waive his right to jury trial. The court dismissed the foreclosure claim on agreement by the parties, and ordered that buyers' motion for summary judgment on seller's claim for money damages be heard at the bench trial on the claim for specific performance. The trial was held on July 1 and 2, 1998.

On January 14, 1999, the court issued findings, conclusions and an order, ruling that buyers were entitled to specific performance of the installment contract as modified by the engineering agreement — in other words, that they were entitled to delivery of the deed to their attorney, and that seller was not entitled to any money from buyers. On January 20, 1999, buyers filed a motion for partial final judgment on the deed-delivery decision, which the court granted on February 23, 1999. Seller then filed a series of post-judgment motions and an appeal to this Court.

On May 6, 1999, the court ruled on the parties' cross-motions for partial summary judgment on seller's claim for money due under the installment contract. The court ruled that buyers did not owe seller any money under the installment contract because that contract had been modified by the engineering agreement, cancelling the monthly installment payments. Buyers moved the court to enter partial final

---

[2] In March 1996, buyers contacted probation officer Ziccardi to find out the status of seller's probation and learned that seller had been discharged. In May 1996, the trustees of the Edwin P. Lord Irrevocable Trust reassigned the trust's interest in the contract back to seller. Buyers occupied the farm until April 28, 1998, but then relocated because seller threatened them on April 27, 1998. They remain, however, in possession of the farm.

judgment on the no-pay decision; seller moved for reconsideration of the court's decision.

In the meantime, this Court issued a show cause order why seller's appeal should not be dismissed for failure to appeal from a final judgment or seek permission to appeal from an interlocutory order, and subsequently, dismissed the appeal, ruling: "Appellant not opposing dismissal for lack of a final appealable judgment, in his response to the Court's show cause order of 5-6-99, appeal dismissed. V.R.C.P. 54(b)." Two days later, the superior court denied seller's motion to reconsider its summary judgment decision on his money claim, and entered partial final judgment on the no-pay judgment.

On July 19, 1999, buyers filed a motion to enforce the deed-delivery judgment, which the court granted on October 27, 1999, ordering seller to deliver the deed to attorney Donahue. In the interval, the court had denied seller's V.R.C.P. 59 motion to amend the deed-delivery judgment, and seller's motion to reconsider the V.R.C.P. 59 denial, as well as seller's V.R.C.P. 60 motion for relief from the no-pay judgment. On November 2, 1999, seller appealed to this Court from the deed-delivery judgment, the no-pay judgment and the order of enforcement. On November 30, 1999, seller filed in this Court a motion to stay enforcement of the deed-delivery judgment, which was denied on January 28, 2000.

Despite the superior court's order to deliver the deed to attorney Donahue, the order to enforce the deed-delivery order, the order denying seller's V.R.C.P. 59 motion, the order denying reconsideration, the order denying seller's V.R.C.P. 60 motion, and this Court's order denying seller's motion to stay the deed-delivery order, seller has not delivered the quitclaim deed to attorney Donahue. Seller contends that he will not deliver the deed until buyers secure an agreement from ANR relieving seller of any obligation for the clean-up. Buyers seek to enforce the terms of the engineering agreement requiring seller to deliver the deed to their attorney to be held in trust until they have an agreement with ANR relieving seller of any obligation for clean-up. Because seller has refused to deliver the deed to buyers' attorney, the case remains at a standstill. The court noted that throughout discussions on the clean-up, ANR has regarded buyers as well-motivated, cooperative and acting in good faith, but that the Agency has not so regarded seller.

With this lengthy history before us, we turn first to the jurisdictional issues raised.

## I. Jurisdiction

The first issue is whether the two partial final judgments — the deed-delivery judgment and the no-pay judgment — issued under V.R.C.P. 54(b), are final judgments for purposes of appeal to this Court. Buyers contend that they are final orders and that the thirty-day period to appeal both decisions expired before seller filed his notice of appeal here, and thus, only the decision to enforce the deed-delivery judgment is properly here on appeal. We disagree.

Under V.R.C.P. 54(b):

> When more than one claim for relief is presented in an action, whether as a claim, counterclaim, cross-claim, or third-party claim, or when multiple parties are involved, the court may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment.

Thus, there are three prerequisites to directing an entry of judgment under V.R.C.P. 54(b): (1) there must be multiple parties or multiple claims for relief, (2) at least one claim or the rights and liabilities of at least one party must be finally decided, and (3) the court must find that there is no just cause for delaying the appeal. See 10 C. Wright, A. Miller & M. Kane, Federal Practice and Procedure § 2656, at 48-60 (3d ed. 1998). There is no contention that any of the V.R.C.P. 54(b) judgments disposed of any of the claims finally. Thus, for V.R.C.P. 54(b) to apply, there must be multiple claims and at least one claim must have been finally adjudicated.

In this case, after dismissal of the claim for foreclosure, there was only one claim or cause of action, which was for breach of a contract to purchase real property. See *Liberty Mutual Ins. Co. v. Wetzel*, 424 U.S. 737, 743 n.4 (1976) ("a complaint asserting only one legal right, even if seeking multiple remedies for the alleged violation of that right, states a single claim for relief" under F.R.C.P. 54(b)). Buyers requested several remedies — specific enforcement of a contract to purchase real property, a declaration that no further sums were due from them to seller or the trustees under the contract, compensatory and punitive damages, and attorneys' fees and costs — but all remedies arose from a single claim for breach of a contract. See Wright, et al., *supra*, § 2657, at 79-81 ("when plaintiff is suing to vin-

dicate one legal right and alleges several elements of damage, only one claim is presented and subdivision (b) [of Rule 54] does not apply"); e.g., *Sussex Drug Prods. v. Kanasco, Ltd.*, 920 F.2d 1150, 1155 (3d Cir. 1990) (when liability rests on same transaction, a count for punitive damages, although different from compensatory damages, is not a separate claim under Rule 54(b)); *Reyher v. Champion Int'l Corp.*, 975 F.2d 483, 487 (8th Cir. 1992) (multiple remedies available under Age Discrimination in Employment Act cases do not transform single claim for age discrimination into multiple claims for Rule 54(b) purposes).

Neither the deed-delivery judgment nor the no-pay judgment was a final decision on this contract claim because each decision left issues on the same contract claim to be decided, specifically liability for property taxes on the farm, and compensatory and punitive damages requested by buyers. "[T]he rule requires that the entirety of at least one of th[e] claims be decided with finality." Wright, et al., *supra*, § 2657, at 68; cf. *State Street Bank & Trust Co. v. Brockrim, Inc.*, 87 F.3d 1487, 1490 (1st Cir. 1996) (order approving judicial sale of receivership assets was not final appealable order under F.R.C.P. 54(b) because court would have to resolve disputed issues — including tax matters, receivership costs and the actual amount realized by the sale — before sale would be binding). Accordingly, we conclude that the court erred in granting partial final judgments under V.R.C.P. 54(b).

█ Buyers contend that, even if the deed-delivery judgment was not a proper V.R.C.P. 54(b) final partial order, it was a final decision under the United States Supreme Court's rule in *Forgay v. Conrad*, 47 U.S. (6 How.) 201 (1848), a rule that we adopted in *Hospitality Inns v. South Burlington R.I.*, 149 Vt. 653, 657, 547 A.2d 1355, 1358 (1988). At first glance, this argument is persuasive: *Forgay* "holds that an order — otherwise interlocutory — will be treated as a final appealable order if it calls for the immediate transfer of real or otherwise unique property." *Id.* at 656, 547 A.2d at 1357. Applied in a single-claim case, "its effect is to treat the order requiring the immediate transfer of the property — although not disposing of the entire case — as final so as to permit immediate review." *Id.* at 656, 547 A.2d at 1358.

The *Forgay* rule is not, however, applicable to every order for immediate transfer of property. As we noted in *Hospitality Inns*, "[t]he purpose of the rule is to protect a litigant from the undue hardship and irreparable harm that could inevitably result from a strict application of the finality requirement." *Id.* at 656, 547 A.2d at 1357-58 In *Forgay*, the rule was applied to allow the record titleholders

to appeal a decision setting aside their deeds as fraudulently conveyed to them during a bankruptcy, directing the property to be delivered and sold, and ordering the proceeds to be distributed among the bankrupt's creditors. 47 U.S. at 204. Had the appellants been required to wait until all accounts had been settled and confirmed by the Court, the property would have been irredeemable and appellants would have been "subjected to irreparable injury." *Id.* Thus, the United States Supreme Court noted, "[t]his rule, of course, does not extend to cases where money is directed to be paid into court, or property to be delivered to a receiver, or property held in trust to be delivered to a new trustee appointed by the court, or to cases of a like description." *Id.*

This is one such case: seller will not suffer irreparable injury by delivering a quitclaim deed for Stonecliff Farm to attorney Donahue to hold in trust for buyers. See *In re F.D.R. Hickory House, Inc.*, 60 F.3d 724, 727 (11th Cir. 1995) (*Forgay* rule allows immediate review when order directs immediate delivery of property and subjects losing party to irreparable harm); 19 Moore's Federal Practice § 202.08 (3d ed. 2000) (*Forgay* doctrine limited to cases where appealing party would be irreparably harmed if appellate review were delayed until conclusion of action). Indeed, even if the order called for delivery of the deed directly to buyers, the record does not show that seller would be irreparably harmed; the more likely scenario is that buyers would begin the clean-up to the benefit of all. Because seller has not shown that he or the property would be irreparably harmed if appeal were delayed until conclusion of this action, the *Forgay* rule is not applicable.

■ Although the deed-delivery judgment and the no-pay judgment are not final decisions and although seller has not requested permission to appeal from an interlocutory order, see V.R.A.P. 5(b), seller urges this Court to act under V.R.A.P. 2, suspend the rule requiring such a request, assert jurisdiction and address the substantive issues that have been briefed. For two reasons, we take this case under V.R.A.P. 2.

First, "allowing an appeal at this stage will most likely expedite the ultimate termination of the litigation consistent with maintenance of the value of the asset involved." *Hospitality Inns*, 149 Vt. at 657, 547 A.2d at 1358. On the other hand, if we do not take this appeal, it appears that this case will remain in stalemate as it has now for several years, to the detriment of the parties, the property and the general

public. It has been eight years since ANR first notified buyers and seller that clean-up of the debris was required, yet, aside from the engineering report obtained by buyers, no steps have been taken in that direction. Buyers are willing to clean up the farm, but reasonably will not do so unless they get a deed to the farm. The deed may well be necessary for buyers to obtain the financing necessary for the clean-up. Seller has taken no steps to clean up the farm, but ANR has not proceeded against him, apparently awaiting the outcome of this litigation. It is clear that this case will not progress — and the farm will not be cleaned up — until some of the issues before this Court are decided finally.

Second, this is already the second appeal from the deed-delivery judgment, the first appeal having already been dismissed because seller failed to show that it was a final judgment. We have no doubt that the judgment would be appealed at least one more time if this case were dismissed now. Moreover, despite two orders to seller to deliver the quitclaim deed to attorney Donahue, and the numerous other orders denying motions to amend, reconsider or stay these orders, seller has not delivered the deed. Seller repeatedly refuses to comply with orders of the superior court, again resulting in a stalemate affecting buyers, the farm, ANR, and the welfare of the general public. As the issues have been briefed and argued and the Court has spent valuable time preparing for the case, dismissal would not serve the interests of judicial economy or any of the persons or entities involved. See *Perry v. Medical Practice Bd.*, 169 Vt. 399, 402, 737 A.2d 900, 902 (1999) (although procedures for perfecting interlocutory appeal were not followed, dismissal of appeal would likely result in another appeal after final judgment, merits had been fully briefed and Court had reviewed case; therefore, Court exercised discretion to suspend rules and reach merits).

## II. Merits

### A. Assignment

On the merits, the trial court relied upon an assignment theory to conclude that the trustees' agreement with the buyers modified the installment contract. The court held that seller had specifically authorized the trustees of the Edwin P. Lord Irrevocable Trust to act on behalf of the trust, that seller had assigned all his interest in the installment contract to the trustees, and that the trustees had full

authority to accept the benefits of the contract or modify the benefits by negotiating with buyers. The trial court rejected buyers' contention that seller's attorney, conservator or guardian — who all exercised authority on seller's behalf at various times — had the authority to act on his behalf concerning Stonecliff Farm.

Seller contends that the court erred in relying on a theory of assignment for two reasons. First, seller contends that the court denied him due process because he had no notice of the assignment theory. We disagree. V.R.C.P. 8(a) requires that "[a] pleading which sets forth a claim for relief . . . shall contain (1) a short and plain statement of the claim showing that the pleader is entitled to relief, and (2) a demand for judgment for the relief the pleader seeks." The rule does not require a specific or detailed statement of the facts establishing the cause of action, but simply a statement clear enough to give a defendant fair notice of the pleader's claim and the grounds upon which it rests. Reporter's Notes to V.R.C.P. 8; see *Molleur v. Leriche*, 142 Vt. 620, 622, 458 A.2d 1139, 1140 (1983). In addition, V.R.C.P. 8(e)(1) provides that "[e]ach averment of a pleading shall be simple, concise, and direct. No technical forms of pleading . . . are required."

In their amended complaint filed on May 23, 1996, buyers alleged that (1) on October 21, 1991, seller assigned the installment contract to the trustees of the Edwin P. Lord Irrevocable Trust, (2) subsequently, attorney Hall — while representing the trustees and seller — drafted the "Agreement regarding Engineering Services and Clean-Up," which modified the installment contract, and (3) this contract modification was signed by buyers, the trustees and seller's conservator by May 5, 1994. Further, buyers alleged that the trustees and the conservator failed to provide buyers with a quitclaim deed as provided in the modified agreement. Although seller contends that buyers relied upon the theory that attorney Hall and the conservator had authority to act on seller's behalf, the complaint also clearly alleged that the installment contract was assigned to the trustees and that the trustees authorized the contract modification.

Seller also maintains that V.R.C.P. 8 requires a complaint to state "all of the facts material to a particular claim or theory," and in his reply brief seller points to numerous facts he contends are material but not alleged. V.R.C.P. 8, however, omits the former requirement that the facts relied upon be pleaded, and requires instead a short, plain statement of the claim showing the pleader is entitled to relief.

Reporter's Notes to V.R.C.P. 8. Having alleged that the contract was assigned by seller, that the assignees modified the contract, that buyers complied with the modified contract, that seller/the trustees breached the modified contract, and that buyers are entitled to specific performance of transfer of the deed to Stonecliff Farm, buyers provided fair notice to seller that the assignment theory was before the court. Nothing more is required. V.R.C.P. 8(f) (pleadings shall be construed as to do substantial justice).

Second, seller contends that the court's reliance on the assignment theory was wrong as a matter of law because the language of the assignment did not support the court's conclusion that the assignment passed all seller's rights in the installment contract to the trustees, nor the conclusion that seller's only remaining role was to convey a deed to buyers upon their satisfaction of the conditions. Moreover, there was no evidence to show that seller intended to delegate any duties to the trustees by the assignment. Thus, seller challenges the court's conclusion that the trustees had authority to modify the installment contract with buyers.

Seller's assignment states that Edwin P. Lord "hereby conveys, transfers, and assigns all of his interest, right and title in and to said Installment Land Contract to Helen Lord and IngaBritt Lillbask, Trustees of the Edwin P. Lord Irrevocable Trust u/a/t dated October 21, 1991." The language of this assignment — "assigns all of his interest, right and title in and to said Installment Land Contract" — is ambiguous to the extent that it makes no mention of delegating seller's obligations under the contract. See *Cedar Point Apartments, Ltd. v. Cedar Point Inv. Corp.*, 693 F.2d 748, 753 (8th Cir. 1982) (phrase "assignment of the contract" is ambiguous, creating difficulty in determining whether it was used to assign rights, delegate duties or both); see also 4 A. Corbin, Corbin on Contracts § 906, at 628 (1951) (difficulty arises when assignment does not differentiate between rights and duties but simply assigns "the contract" or "all right and title to the contract"); 3 W. Jaeger, Williston on Contracts § 407, at 13 (3d ed. 1960) (there has been much confusion concerning assignments of bilateral contracts while both sides are still executory unless the assignment specifically addresses both rights and duties).

Assignments of bilateral contracts often cause difficulties and confusion when they do not specifically address assignment of rights and delegation of duties. Thus, "[i]f the contract is still bilateral in character, so that the assignor has a duty to perform as well as a right

to a performance by the third party, interpretation must depend chiefly upon the context and the surrounding circumstances." Corbin, *supra,* at 628-29.[3]

In this case, we agree with buyers that the trustees' assumption of seller's obligations in the installment contract is implied by the conduct of the parties. The trustees negotiated with buyers an agreement under which buyers would assume the mortgages and the remediation costs, both obligations of seller under the installment contract, in exchange for $30,000 toward the remediation costs and cancellation of buyers' payments due under the installment contract. Moreover, the negotiations were undertaken and the new agreement drafted by the attorney for the trustees, who simultaneously represented seller in related criminal proceedings, and the attorney told buyers and the court that the trustees had the deed to Stonecliff Farm and would deliver a deed to buyers pursuant to the contract modification. Further, seller's attorney used the new agreement to obtain a reduction in seller's criminal sentence.

All of the evidence indicates that the trustees had assumed all of the obligations under the installment contract, except the fact that seller retained the deed to Stonecliff Farm, a fact that was concealed from buyers, the court, and the attorney representing both the trustees and the seller. Under these circumstances, we conclude that the conduct of the parties implied a delegation of the contractual duties by seller and an assumption of these duties by the trustees of all seller's obligations under the installment contract. Cf. *Auer & Twitchell v. Robertson Paper Co.,* 94 Vt. 473, 483, 111 A. 570, 574 (1920) (conduct of parties, including correspondence, showed acceptance of obligations by assignee). Although the trustees had the obligation to deliver the deed, and represented to buyers that they would do so, seller retained the deed and consequently the obligation to deliver

---

[3] The Restatement (Second) of Contracts § 328(1) (1981) states: "Unless the language or the circumstances indicate the contrary, as in an assignment for security, an assignment of 'the contract' or of 'all my rights under the contract' or an assignment in similar general terms is an assignment of the assignor's rights and a delegation of his unperformed duties under the contract." The Restatement, however, provides an exception for land contracts, and indicates that unlike other contracts, in the case of land contracts, "ordinarily no assumption of the vendor's duties by the assignee is implied merely from the acceptance of the assignment." *Id.* cmt. c. These presumptions are applicable where the language of the assignment is ambiguous unless other language "or the circumstances indicate the contrary." *Id.* § 328(2) In this case, the circumstances indicate that the trustees assumed the obligations of the installment contract.

it. Thus, we agree with the trial court that the trustees had the authority to negotiate and modify the bilateral obligations in the installment contract.

Seller relies on *Cedar Point* in his contention that the trustees had no right to modify the contract. *Cedar Point* is distinguishable for numerous reasons, but primarily because it involves construction of a contract provision attempting to limit assignability of the contract. To the extent that *Cedar Point* is at all relevant to this case, it tends to support our conclusion because it concludes that the promise of the assignee to assume the assignor's duties can be implied by the assignee's conduct. 693 F.2d at 755. Here, the conduct of the trustees clearly implies that they assumed the duties of the installment contract. See also *Shepard v. Commercial Credit Corp.*, 123 Vt. 106, 110, 183 A.2d 525, 527-28 (1962) ("The assignee of a contract is usually not liable to the other contracting party to the contract assigned unless such liability has been expressly or impliedly assumed by the assignee.").

Seller argues that the trial court relied solely upon the language of the assignment, however, and did not draw any conclusions from the conduct of the parties. Seller is correct. We disagree with the trial court, however, because the language of the assignment is simply general language assigning "all interest, right and title in and to said Installment Land Contract." Because the language of the contract does not specifically address a delegation of duties, the language is ambiguous, and we cannot conclude from the language alone that the trustees assumed seller's duties under the installment contract. The parties' conduct and correspondence is, however, clear. Thus, we conclude on grounds differing from those of the trial court that the trustees did assume seller's duties under the installment contract. See *Gochey v. Bombardier, Inc.*, 153 Vt. 607, 613, 572 A.2d 921, 925 (1990) (we may affirm correct judgment although ground stated in support of it is erroneous). No other conclusion could be drawn from the court's findings on the conduct of the parties.

Finally, seller relies upon the Restatement (Second) of Contracts § 338(2), which states that notwithstanding notification to the obligor of the assignment, "any modification of or substitution for the contract made by the assignor and obligor in good faith and in accordance with reasonable commercial standards is effective against the assignee," who acquires corresponding rights under the modified or substituted contract. Seller contends that, although he assigned the installment

payments to the trust, under § 338(2), he retained the right to modify the contract with buyers, and thus, the trustees could not have also had authority to modify the contract with buyers. We reject seller's argument. Even assuming that § 338(2) applies to a land installment contract in Vermont — providing that the assignor retains authority to modify the contract with the obligor — this would not necessarily imply a corresponding rule — that the assignee lacks authority to modify the contract with the obligor. Cf. Restatement (Second) of Contracts § 338(3) (assignee has same power assignor had to modify duty of obligor to extent that obligor gives value or changes position in good faith). In sum, § 338(2) provides no support for seller's claim that the trustees had no authority to modify the installment contract.

## B. Equity

Next, seller contends that the court abused its discretion by holding that it was equitable to order seller to deliver the deed to Stonecliff Farm to buyers' attorney to hold in trust. The trial court held that, under all the circumstances, specific enforcement of the modified contract was equitable. Specifically, the court noted that enforcing specific performance of the modified contract would not result in any windfall or unjust enrichment to buyers as buyers would incur the following total expenses:

| | |
|---|---|
| (1) Payments under original installment contract including deposit | $105,017 |
| (2) Monthly payments made to seller's mortgagee | $ 7,682 |
| (3) Purchase of seller's mortgages from bank | $ 65,000 |
| (4) Engineer estimate for clean-up | $218,100 |
| (5) Outstanding obligation to engineering firm for report[4] | $ 7,635 |
| (6) Cost of survey necessary to obtain bank loan[5] | $ 1,500 |
| (7) Bank charges for aborted loan | $ 1,150 |
| | $406,084 |

---

[4] CEH overran its estimate of $25,630 for the report and submitted a bill for $37,867.32. Attorney Donahue has paid $30,232.28, the $30,000 held in trust plus interest. CEH claims the remaining $7,635.04 is due from buyers.

[5] The Woodsville bank did not want a mortgage on any of the contaminated portion of the farm; therefore, it required buyers to hire a surveyor to run lines defining a large portion of the farm that did not contain debris. Buyers hired a surveyor to do so.

Further, the court found that if seller delivers the deed to Stonecliff Farm as ordered and if he is relieved of any obligation to clean up the site, he will have realized the following benefits:

| | |
|---|---:|
| (1) Payments received under the installment contract | $105,017 |
| (2) Substitution of $30,000 restitution for $100,000 fine | $ 70,000 |
| (3) Avoidance of clean-up costs | $218,100 |
| (4) Discharge of mortgage debt ($71,807.90 + 51,018.26) | <u>$122,826</u> |
| | $515,943 |

The court also noted that seller avoided two years in prison under the sentence-reduction agreement negotiated in conjunction with the contract modification. In sum, the court concluded that the rights of the parties are clear under the modified contract, an order for specific performance will ensure that the parties receive the benefits contemplated by the modification, and specific enforcement would not be unjust or unconscionable.

"[S]pecific performance is the usual remedy for the seller's breach of a real estate contract." *Colony Park Assocs. v. Gall*, 154 Vt. 1, 6, 572 A.2d 891, 895 (1990). Nonetheless, the court may exercise discretion based upon equitable considerations, including the sufficiency of the consideration; mutuality, certainty and clarity; completeness and fairness of the contract; its capability of proper enforcement by decree; and any showing that the contract is tainted, or impeachable or that its enforcement would be unconscionable. *Johnson v. Johnson*, 125 Vt. 470, 472-73, 218 A.2d 43, 45 (1966). We will reverse a decision to grant specific performance only upon a clear showing of an abuse of discretion. *Id.* at 473, 218 A.2d at 45. In this case, we agree with the trial court that seller has shown no grounds to deny specific performance.

Seller contends that buyers' hands were unclean for several reasons. First, seller contends that buyers could have done the clean-up in 1992 and deducted the cost from their installments as provided in the installment contract and that the cost of clean-up at that time would have been less than the amount owed under the contract. The short answer to this argument is that, in 1992, the clean-up was seller's obligation under the installment contract.

Second, seller contends that buyers breached the modified contract by failing to enter into negotiations with ANR to obtain an order making them solely responsible for the clean-up. The engineering agreement is clear, however, that buyers have no obligation to enter into negotiations with ANR until the deed is delivered to their attorney. The agreement provides that seller and the trust, "pursuant to this agreement, shall provide the Kellys a Quit Claim Deed of all their interests in the Stone Cliff Farm property, such deed to be held in trust by William Donahue, Trustee, until such time as the Kellys enter into their Assurance of Discontinuance agreement with the State as required by ¶ 2 above, to undertake the clean-up of the Stone Cliff Farm property site." Because seller has not delivered the deed to buyers' attorney as required by the modified contract, buyers had no obligation to enter negotiations with ANR.

Third, seller contends buyers embarked on a scheme to obtain the deed to Stonecliff Farm while keeping seller jointly liable for the clean-up of the farm. This contention is simply contrary to the evidence and the findings. As the court concluded, buyers stand ready to do the clean-up to ANR's satisfaction but will not do so until seller delivers the deed to their attorney as required by the modified contract. This position is both consistent with the terms of the modified contract and, under the circumstances in this case, completely reasonable.

## C. Enforcement Order

Next, seller contends that the court erred in issuing an enforcement order requiring seller to deliver the deed to buyers' attorney. He contends that because the deed-delivery judgment is not a final judgment for purposes of appeal, it is also not enforceable. For this claim, seller relies upon V.R.C.P. 69, which he contends provides for enforcement of judgments. V.R.C.P. 69, however, addresses execution on a money judgment, and thus, is not applicable to the deed-delivery judgment for specific performance.

## D. Installment Payments

Seller argues that the court erred by ruling that the contract modification cancelled buyers' obligation to pay monthly installments under the installment contract. He first contends that he was denied due process because he had no notice that the court would rely upon the theory of necessary implication — that a term cancelling the installment payment was necessarily implied into the modified agree-

ment, otherwise the contract was unreasonable. On the merits, seller claims that the court was wrong as a matter of law because there was no necessity to imply into the modified contract a term cancelling buyers' remaining installment payments. Instead, the court should have required buyers to clean up the property and then to deduct the cost of the clean-up from the installment payments as provided in the original contract. According to seller, under this construction, the modified contract is consistent with the original agreement. Finally, seller argues that buyers received substantial benefits from the contract modification even if they continue to be obligated to make the installment payments because they avoid being named as jointly liable with seller and they get to take control of the clean-up, both issues about which they were very concerned.

Seller correctly asserts that the trial court relied upon three different theories. In the findings, conclusions and order of January 14, 1999, on the issue of specific performance, the court relied upon a theory of merger. In its subsequent decision on the cross-motions for summary judgment on seller's counterclaim for payments under the installment contract, the court decided that a provision in the engineering contract cancelling the installment was implied by necessity. And finally the court decided on the motion for reconsideration that, by agreeing in the engineering agreement to quitclaim all interests in Stonecliff Farm to buyers, the trustees agreed to divest themselves of all interest in the farm including any installment payments.

In reviewing a summary judgment decision, we apply the same standard as the trial court; summary judgment is appropriate where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *O'Donnell v. Bank of Vermont*, 166 Vt. 221, 224, 692 A.2d 1212, 1214 (1997). We conclude, as a matter of law, that the installment contract merged into the engineering contract, which presents only one reasonable interpretation. Because seller had notice of the merger or modification theory, indeed that was buyers' main contention throughout the proceedings, we conclude further that he was not denied due process.

■■■ The theory of merger "applies to successive agreements that cover the same subject matter and contain inconsistent terms." *Dartmouth Savings Bank v. F.O.S. Assocs.*, 145 Vt. 62, 69, 486 A.2d 623, 627 (1984). In such a case, a prior agreement is deemed to have merged into the more recent document. *Id.* In this case, the

installment contract merged into the engineering agreement. The question is whether the provision requiring buyers to make installment payments to seller was cancelled by the merger or continues in effect.

Unless ambiguous, the construction of a contract is a question of law. See *Morrisseau v. Fayette*, 164 Vt. 358, 366, 670 A.2d 820, 826 (1995). And the question of whether the contract is ambiguous is also a question of law. *Id.* In determining whether the language is ambiguous, it is appropriate to consider the circumstances surrounding the agreement. *Isbrandtsen v. North Branch Corp.*, 150 Vt. 575, 579, 556 A.2d 81, 84 (1988). "Ambiguity will be found where a writing in and of itself supports a different interpretation from that which appears when it is read in light of the surrounding circumstances, and both interpretations are reasonable." *Id.*

Here, we find, as did the trial court, that there is only one reasonable interpretation whether viewing the two contracts in and of themselves or when reading them in light of the surrounding circumstances. The original installment contract provided that buyers would make installment payments for fifteen years and upon final payment seller would deliver them a warranty deed. Under that contract, seller was responsible for the clean-up and his two mortgages. Under the engineering agreement, buyers took over responsibility for the clean-up and the mortgages in exchange for immediate delivery of the deed — to be held in trust until ANR agreed to their sole responsibility for the clean-up. In short, buyers were entitled to deed delivery for taking on sole responsibility for the clean-up and the mortgages.

Seller's construction of the merged contract — requiring continued installment payments — is simply unreasonable. The engineering agreement provides that seller is under a condition of probation requiring him to relinquish title to the farm to buyers provided they undertake responsibility for the clean-up. It does not indicate any requirement for buyers to continue to make installment payments after receiving title. Indeed, it is unreasonable to believe that buyers would agree to continue to make installment payments for the full fifteen years in order to obtain a deed they had already obtained for taking on seller's clean-up responsibilities from the original contract. Considering the merged contract in and of itself, buyers' new responsibilities are inconsistent with their previous responsibilities; therefore

the new contract must be construed to have substituted the new responsibilities for their previous ones.

■ Viewing the merged contract in light of the surrounding circumstances, we conclude again that there is only one reasonable interpretation. The correspondence between attorney Hall and attorney Donahue, attorney Hall's representations to this Court and to the district court in the criminal proceedings, the sentence-reduction order, and the probation order all support the same interpretation: buyers' responsibilities under the engineering agreement are inconsistent with the responsibilities in the installment contract, and therefore, were substituted for those responsibilities. Because the merged contract in and of itself has only one reasonable interpretation, and because we find the surrounding circumstances support a consistent interpretation, we conclude that the merged contract is not ambiguous. The only reasonable interpretation is the one reached by the trial court; thus, we affirm the no-pay judgment. See *Morrisseau,* 164 Vt. at 367, 670 A.2d at 826 (affirming trial court's construction of land purchase agreement because it was most consistent with both unambiguous language and surrounding circumstances); *Isbrandtsen,* 150 Vt. at 581, 556 A.2d at 85 (holding that only one reasonable interpretation exists when viewing language of deed in light of surrounding circumstances).

## E. Findings of Fact

Lastly, seller contends that the court erred in finding that ANR would allow capping in lieu of removal of debris only if buyers were ultimately responsible for the clean-up.[6] He maintains that the undisputed testimony was that it did not matter to ANR who did the capping. Because this finding is unnecessary to the resolution of this case, we do not address it. See *Abbiati v. Buttura & Sons, Inc.*, 161 Vt. 314, 320, 639 A.2d 988, 992 (1994) (nonessential erroneous finding is not ground for reversal).

---

[6] For purposes of the cross-motions for summary judgment on seller's claim for continued installment payments, seller agreed to the facts found by the court in the January 14, 1999 findings, conclusions and order, by failing to identify any issues of disputed fact. Thus, the challenge to the findings is relevant only to the order for specific performance of the deed delivery.

## III. Conclusion

Our review of the record in this case convinces us that seller has repeatedly violated orders of the courts by refusing to deliver the deed to attorney Donahue, and has made every effort to delay the legal proceedings by filing an unreasonable number of motions following each of the court's decisions. As a result of seller's actions, the clean-up of the farm has been stalled for several years to the detriment of buyers, the farm and the welfare of the people of this state. To end the delays we direct the superior court to enter an order under V.R.C.P. 70, directing another person to deliver the deed to attorney Donahue such that the act has the same effect as if it had been done by seller. See V.R.C.P. 70.

*Affirmed and remanded. The trial court is directed to enter an order under V.R.C.P. 70 to effect delivery of the quitclaim deed to attorney Donahue forthwith. This mandate shall issue forthwith.*